Joseph DAIN, Daryle Engelen, Foy G. Johnson, Philip Newman, Douglas G. Leon, and Fred Shaft, Appellants,

v.

Norman L. PAWLEWSKI, Iowa Commissioner of Public Health, and Iowa Board of Chiropractic Examiners, E. C. Vorland, President, Gerald Whitten, Secretary, and Anthony P. Untz, Superintendent of Examinations, Appellees.

No. 2–58606.

Supreme Court of Iowa.

May 25, 1977.

Scalise, Scism, Gentry, Brick & Brick, Des Moines, for appellants.

Richard C. Turner, Atty. Gen., and Larry M. Blumberg, Asst. Atty. Gen., for appellees.

Heard by Moore, C. J., and LeGRAND, UHLENHOPP, REYNOLDSON and HARRIS, JJ.

UHLENHOPP, Justice.

This appeal primarily involves interpretation of our rather complicated statute governing licensure of individuals to practice chiropractic. See Code 1973, ch. 151; 65 G.A. ch. 1144.

Two schools of thought appear to exist in Iowa as to the scope of chiropractic, represented respectively by the Chiropractic Society of Iowa and the Iowa Chiropractic Society. The former society holds the tra-

ditional view that chiropractic is limited to the location and correction, by spinal or other incidental adjustments by hand, of subluxated vertebrae which may be impinging upon the normal transmission of nerves and affecting the normal functions of tissues. The latter society would add the use of certain "other modalities"—heat, cold, exercise, and supports—not as independent therapy but as procedures incidental to the adjustments. As the Iowa law stood at the beginning of 1974, the practice of chiropractic was limited to the more restricted view espoused by the former society, Chiropractic Society of Iowa. Code 1973, § 151.1(2). The other modalities constituted part of physical therapy, licensed under chapter 148A of the Code.

More and more Iowa practitioners of chiropractic, however, began to use the other modalities incidental to the adjustments. A survey answered by 50% to 60% of the practitioners disclosed that 90% of them did so. Practitioners using the other modalities feared prosecution for infringing upon physical therapy.

In 1974 the legislature passed an act allowing chiropractic practitioners to use the other modalities under certain circumstances. 65 G.A. ch. 1144. In the previous Code of 1973, § 151.1(2) read:

> For the purposes of this title the following classes of persons shall be deemed to be engaged in the practice of chiropractic: . . .

> Persons who treat human ailments by the adjustment by hand of the articulations of the spine or by other incidental adjustment.

With the passage of the amendment, § 151.-1(2) reads:

> For the purposes of this title the following classes of persons shall be deemed to be engaged in the practice of chiropractic: . . .

> Persons who treat human ailments by the adjustment of the musculoskeletal structures, primarily spinal adjustments by hand, *or by other procedures incidental to said adjustments limited to heat,*

*cold, exercise and supports, the principles of which chiropractors are subject to examination under the provision of section 151.3, but not as independent therapeutic means.* (Italics added.)

This litigation mainly has to do with the portion we have italicized.

The amendatory act, chapter 1144, also contained the following new section which is involved in this litigation (now § 151.8 of the 1977 Code):

A chiropractor shall not use in his practice the procedures otherwise authorized by law unless he has received training in their use by a college of chiropractic offering courses of instructions approved by the board of chiropractic examiners.

Any chiropractor licensed as of July 1, 1974, may use the procedures authorized by law if he files with the board of chiropractic examiners an affidavit that he has completed the necessary training and is fully qualified in these procedures and possesses that degree of proficiency and will exercise that care which is common to physicians in this state.

We take it that "the procedures otherwise authorized by law" in this section refer to the incidental use of heat, cold, exercise, and supports specified in the newly-enacted definition of chiropractic.

Two other sections, which were not changed, are relevant to our inquiry:

§ 151.3. Every applicant for a license to practice chiropractic shall:

1. [Present evidence of education equal to graduation from secondary school.]

2. Present a diploma issued by a college of chiropractic approved by the chiropractic examiners.

3. Pass an examination prescribed by the chiropractic examiners in the subjects of anatomy, physiology, symptomatology and diagnosis, hygiene and sanitation, chemistry, histology, pathology, and principles and practice of chiropractic, including a clinical demonstration of vertebral palpation, nerve tracing and adjusting.

(To this list of subjects in § 151.3(3), we take it that the legislature has added inci-

dental use of "heat, cold, exercise, and supports" by virtue of the clause in new § 151.-1(2), "the principles of which chiropractors are subject to examination under the provisions of section 151.3".) Also:

§ 151.4. No college of chiropractic shall be approved by the chiropractic examiners as a college of recognized standing unless said college:

1. [Requires four academic years.]

2. Gives an adequate course of study in the subjects enumerated in subsection 3 of section 151.3 and including practical clinical instruction.

3. [Publishes a catalogue.]

The amendments to chapter 151 took effect July 1, 1974. They did not pose a problem of application to students who still had a period of school after July 1, 1974; those students could take a course in the other modalities and thus comply with § 151.4(2) (which requires an adequate course in the subjects enumerated in § 151.-3(3)—now including the other modalities by virtue of the amendments). But application of the amendments posed problems for the board with respect to (a) those then-graduating students who would take the next license examination in August 1974 but who had not taken a course in the other modalities, and (b) individuals then licensed who had not taken such a course but desired to use the other modalities in their practice.

The board sought a way to apply the amendments to classes (a) and (b) in accordance with legislative intent. The testimony of the examiners and the minutes of their meetings are understandably somewhat unclear. Most chiropractic colleges already had a course of 120 hours in the other modalities. Palmer College of Chiropractic did not have a course but agreed to and did set up a course of 60 hours (increased to 120 hours by the fall of 1975, as we understand the record). All of these schools were approved colleges of the board so that, according to the testimony, if an individual took the course in one of these colleges he would in the judgment of the board have taken an

adequate course under § 151.4(2), if a student, or have completed the necessary training under new § 151.8, if a present practitioner. Moreover, since the course work was 120 hours, or 60 hours for the time being at Palmer, his course would automatically be 120 hours or 60 hours as the case might be. The board's minutes were couched in terms of these number of hours, but the testimony of the chairman of the board demonstrates that the board's decision actually was in terms of the courses given by approved colleges.

Specifically, the board decided to let students in class (a) take the examination in August 1974 except as to the other modalities. These students could then take Palmer's 60-hour course, and the board would give them a special examination on the other modalities in the fall of 1974. Presumably if these students had desired to take a longer or different course on the other modalities, they could have done so at an approved college and then taken that part of the board's examination.

The board also permitted the present practitioners in class (b) to take a course in the other modalities—which would be the Palmer 60-hour course, or a longer course at other colleges or at Palmer later. Those practitioners could then certify themselves in the other modalities by affidavit under § 151.8.

In this manner the board made the transition required by the amendments to chapter 151.

Plaintiffs are members of classes (a) or (b). They challenge the board's action. Basically they contend (1) that the board misinterpreted the amendment by requiring a course on the other modalities be taken by all students and by practitioners wishing to use the other modalities, and (2) that the board adopted "rules" and the rules were invalid because they were not processed under chapter 17A of the Code, because they were in conflict with the amendments to chapter 151, and because they were beyond the authority of the board to promulgate.

I. *Interpretation of Amendment.* The gist of plaintiffs' first contention is that § 151.3 establishes three requirements for licensure (secondary education, diploma from chiropractic college, passage of board's examination), but that the board imposed a fourth requirement of course work in the other modalities for students and also for present practitioners who wish to use the other modalities. Plaintiffs insist that this fourth requirement is contrary to the statute as amended.

We agree of course with plaintiffs that the board could not lawfully impose requirements contrary to the statute. *State v. Van Trump,* 224 Iowa 504, 275 N.W. 569; *Goodlove v. Logan,* 217 Iowa 98, 251 N.W. 39. But we do not believe the board did so by requiring course work in the other modalities.

■ As to the students in class (a), four provisions of chapter 151 as amended must be read together. First, § 151.1(2) specifies the other modalities (incidental use of heat, cold, exercise, and supports) and continues, "the principles of which chiropractors are subject to examination under the provisions of section 151.3 . . . ." Second, § 151.-3(3) must, therefore, be held to include in its enumeration of examination subjects the subject of the other modalities. Third, § 151.4(2) provides that the board may not approve a chiropractic college unless, inter alia, the college gives "an adequate course of study in the subjects enumerated in subsection 3 of section 151.3 . . . ." Finally, § 151.3 requires that an applicant to take the board's examination must present "a diploma issued by a college of chiropractic approved by the chiropractic examiners." These four provisions add up to a requirement that students in class (a) take a course in the other modalities.

As to practitioners in class (b), the two paragraphs of new § 151.8 must be read together. The first paragraph, which we have previously quoted, prohibits a chiropractor (which would include a present practitioner) from using the procedures otherwise authorized "unless he has received training in their use by a college of chiropractic offering courses of instructions ap-

proved by the board of chiropractic examiners." The second paragraph expressly permits a practitioner licensed as of July 1, 1974, to use the other modalities if he files his affidavit stating among other things "that he has completed the necessary training . . . ." These two paragraphs add up to a requirement that a practitioner in class (b) have a course in the other modalities before he may use them.

The board acted within chapter 151 as amended in requiring plaintiffs to take a course in the other modalities in an approved chiropractic college before a student in class (a) could take the examination on that subject and before a practitioner in class (b) could use the other modalities in practice.

II. *Validity of "Rules."* Plaintiffs claim that the board promulgated "rules" requiring a course on the other modalities and establishing the length of the required course, and that the rules are invalid for the three reasons we have set out. The trial court held the board did not promulgate rules; the board merely rendered an ad hoc decision applying the statute to the specific situation before it.

Under § 17A.1(3) of the Code of 1973, a rule was defined as "any rule, regulation, order or standard of general application [that implements or interprets law or policy,] or the amendment, supplement, repeal, rescission, or revision of any rule, regulation, order or standard of general application." Elsewhere rule is defined as "[a]n established standard, guide, or regulation; a principle or regulation set up by authority, prescribing or directing action or forebearance; as, the rules of a legislative body, of a company, court, public office, of the law, of ethics. A regulation made by a court of justice or public office with reference to the conduct of business therein." Black's Law Dictionary (Rev. 4th Ed.).

We think the board did not promulgate a "rule" that the individuals in question had to take a course in other modalities. The legislature established that rule; the board merely enforced the statute.

Plaintiffs have a stronger argument that the board did establish a rule as to the length of the course. Examination of the board's minutes reveals language that at least a 60-hour course was required for individuals taking the course at the outset and that a 120-hour course was required for individuals taking the course later. On the other hand, the testimony of the board's chairman reveals that the number of hours was not controlling, so that the board did not actually establish a rule on that subject. He testified that the board would approve an otherwise proper course on the other modalities given by an approved chiropractic college although the number of hours differed from 60 hours or 120 hours stated in the board's minutes. His explanation of the statement of the number of hours in the minutes was that such were the hours of the courses in fact given by the approved colleges and that approval of those colleges would ipso facto mean the individual had received the enumerated hours. Like the trial court, we accept this testimony as true, with the result that the board did not adopt a "rule" but merely applied the statute giving the board authority to approve colleges of chiropractic. The number of hours followed from that as a matter of the colleges' curricula. Some of the chairman's testimony along this line is as follows:

Q. Did you look over a course schedule by Palmer for the chiropractors who were already in practice as of July 1st, 1974? A. Yes, sir.

Q. Did you approve that? A. Yes, sir.

Q. And as I understand it it was that one that you said must be 60 hours? A. Yes, sir.

Q. Did you tell Palmer College that they had to set up a 60-hour requirement on courses for incidental procedures for those who were not licensed as of July 1st, 1974? A. No, sir.

Q. What did their course consist of for those individuals not licensed? A. The same type of course that was—they used for those that were licensed.

Q. And how many hours did they have? A. Sixty hours.

Q. Again, did you make that 60 hours mandatory on that course also? A. We agreed, but not mandatory.

Q. You approved it? A. Yes, sir, we approved it. . . .

Q. So your recommendation to Palmer was that the course be of a period duration not less than 60 hours when they put together the course for the men in the field? A. Well, they put—to them, yes.

Q. Okay. Fine. And then when you asked them to put together a course for the students or for those doctors not licensed to the effective date of the act, they put together a similar course, didn't they? A. They took the similar course.

Q. They took a similar course, and did you not then embody and mandate the fact that they had—that an applicant had to have 60 hours before he could be licensed? A. He had to have a certificate from the college that he had taken this course.

Q. Okay. Well, that's basically the same? A. But it didn't state 60 hours or what. It just said they had to have a certificate. . . .

Q. And if a person had come in who had 25 hours of school and certified to you that he had 25 but not 60, he would not be able to take—get his license until he had 60 hours, is that not correct? A. Oh, Oh, I see what you mean. No. They're required, a certificate of proficiency from the school outside of the—of Iowa. Other colleges teach physiotherapy. It's a required course. In some it's an elective. In some, if they showed a certificate of proficiency we—we would have given them the test.

Q. Without 60 hours? A. We would not have asked the 60 hours there because there is no college—there were elected courses outside the State of Iowa which is all 120.

Q. Well, suppose he had not take any at all? A. Then he would have to take physiotherapy.

Q. And he'd have to take the 60 hours? A. Well, in other words, he'd have to have the certificate of proficiency.

Q. And to get the certificate of proficiency, he would have to take 60 hours? A. If he took it from Palmer College he—they had set up a 60 hours okayed, approved by the Board of Examiners, but if he'd have taken it from the college of which he came from it would automatically be 120.

Q. So he would have to have a minimum of 60 hours, regardless of where he got it? A. A certificate from his college.

. . .

Q. Did you make any 60-hour requirement—did you intend to make any 60-hour requirement mandatory on anybody becoming licensed after July 1st, 1974? A. Actually, the beginning, it was not our intent, but the college, the Palmer College was in its infancy on this ancillary procedure and incidentals and asked us for guidance, and as we told them that we were not—we were not instructors or educators but we did guide them on the—on the syllabus and the—the hours involved.

Q. Did you make those hours mandatory upon the schools for those people who were not licensed as of July 1st, 1974? A. We did not make it mandatory on the schools at all, but beings the schools took this particular syllabus and set up 60 hours we approved this and put it out as 60 hours for the board.

Q. So, in the minutes and in any letter where you state, or any information to go along with an application, where it has been stated that a requirement of 60 hours, was that the requirement that the board made? Was it mandatory by the board, or was it a reflection of what the schools had done? A. It was more a reflection of what the schools have done and we accepted it and so we used that as—mandatory. . . .

Q. If the board received a certificate of proficiency from a school, any school, that had a course of 50 hours or 30 hours or 20 hours, anything less than 60 that you had approved, would you allow that

**588**

person to take the examination? A. I'm sure we would.

Q. And you would not impose the 60-hour requirement on them? A. No, because we had approved the college.

Q. So, in other words, you approve the curriculum of the college and not the number of hours they have? A. Yes. Yes, sir. . . .

Q. If you had received a course syllabus with less than 60 hours would you have adopted that, approved it? A. We'd approve the college—

Q. No, I'm not talking about the college. A. Oh, yes.

Q. You would approve the course syllabus in physical therapy, I understand you to say? A. Yes.

Q. You would have approved a course syllabus with less than 60 hours from a school that now is sending a syllabus to Iowa for accreditation here? A. I'm sure we would.

Q. You would have approved a syllabus? A. I'm sure we would, because we're approving the college.

Q. What is that? A. Because we're approving the college as a whole. I'm sure we would.

We thus agree with the trial court that the board did not promulgate rules, and we uphold the action of the board in applying the statute to the specific situation before it. We intimate no opinion on whether the board's action would have been valid had it consisted instead of promulgation of a rule requiring a course on the other modalities or specifying the minimum length of the course.

AFFIRMED.